Chris Cabanillas on behalf of the United States And Ellis Johnson on behalf of Mr. Loughner So judges we have all parties, both parties online and if we could request the parties if you are not talking if you can mute your phones I have my phone but if that becomes a problem whoever is having a problem should let me know and I can pick it up it's easier this way Alright if we're all here good afternoon and thank you all for coming at such short notice We are going to hear an argument on the motion for an emergency stay in the United States v. Loughner So Mr. Loughner's attorney can begin Just for a bit of direction at least some of the things I would like to know as you go on are first of all a discussion of irreparable harm since we know that's the sine qua non under winter and at some point some illumination as the order suggested as to the overall reach of the current appeal I gather that the order in question also addressed the Harper 3 hearing is that going to be the subject of appeal I gather there's no stay motion with regard to that So my understanding of where we stand is that the Harper medication is going to be ongoing for now until there's a ruling from this court on whether he is transported back to Missouri or whether he stays in Tucson and the importance of that circumstance to your argument is also something that matters to me Thank you Let me start by saying that the Harper 3 determination is in fact part of this appeal but I'd like to start by talking about the reasons for the stay of the commitment order itself. In certain respects we agree with the district court that his decision to commit Mr. Loughner to Springfield for purposes of restoring him to trial competency is, to use the district court's words, a game changer. This is because the decision to commit him for this purpose implicates two additional rights that are inextricably intertwined with his right to be free from forced medication The first of these rights is the right to be free from involuntary commitment and restoration and this is a right that the Supreme Court identified in Vitek v. Jones as being separate from mere detention. The second right that's now squarely before the court because the purpose of commitment is to restore Mr. Loughner to trial competency is Mr. Loughner's right to have a fair trial a right that's more expansive than just trial competency and has been articulated by the Supreme Court in Riggins and subsequently in Sell and its progeny. With these rights in mind any decision to commit Mr. Loughner for the purpose of restoring competency requires the court to consider the means employed and in this case the means employed are forced psychotropic medications and has to determine that they're substantially unlikely to create effects and impair Mr. Loughner's ability to attain the capacity to go to trial. In other words, what we have argued to the district court and what we now have as the subject of this appeal is that the court must make a prediction, not just whether Mr. Loughner's mental condition has improved but whether side effects of the drugs being administered to him impair his fair trial rights. And this predictive analysis can only be performed if the court first adequately considers current side effects of the drugs and two, any potential side effects of the intended course of treatment or any expected changes in the intended course of treatment are likely to cause. May I interrupt you please? Yes. Judge Wallace, what evidence did you present of any side effects which are predictable or any evidence at all of how those side effects evidence of side effects, how they would affect his fair trial? Let me answer that question first by just reminding the court that it's the government's burden under our analysis of the law to... I know that. Would you answer my question first and then you can go ahead and embellish it. Thank you, Your Honor. The evidence that was presented in this hearing actually is supported by findings of the court concerning Mr. Loughner's demeanor or to be more explicit, his lack of demeanor, his lack of expression. The court actually raised concerns about his expressionlessness, his apparent motionlessness during the trial. I think this is best articulated on pages 282 and 283 of the transcript. Certainly... Judge Zell did in his order on this day and to some degree in his earlier order maintain that he did take that particular effect into account predictably. In other words, recognizing that that was the circumstance of now he predictably took it into account or he says he did. The court says that in the Monday morning order that to be clear the court wouldn't have found substantial likelihood of competency if he was concerned about these side effects. That simply is belied by the record and if the court will look at pages 282 through 283... First of all, do you have any answer to Judge Wallace's question in terms of what particular evidence there was? And then I have a question. Okay, the evidence was identified by Dr. Pites. She identified his expressionlessness. I believe that she described it as a flat affect during the hearing. She admitted to on cross-examination that this can be a side effect of the drugs that Mr. Loeffner is currently being medicated with. But the question for us now, isn't it, is whether this was taken into account predictably, meaning was it taken into account whether this would be improved in the meanwhile? The clear answer is that it was not. The court made clear not only when it discussed these side effects at the end of the hearing but also during cross-examination that side effects in the court's mind were not a consideration of the hearing. The court says at the end of the hearing that the questioning today has brought out the possibility of side effects that could be debilitating, but he says this is not the appropriate time to consider it. That admission in and of itself I think is evidence that the court didn't appreciate the predictive analysis that we argued 42-41. I understand it. The question of the current impact of this order is that he's going to be transported to Springfield, Missouri and medicated under the Harper order there instead of staying in Tucson and being medicated under the Harper order there. Is that basically right for the moment? Yes, Your Honor. Mr. Loeffner is currently being medicated in the government's view under the Harper order that was recently issued in September. I believe they referred to it as Harper III. That continues. That continued in Springfield when Mr. Loeffner was transferred to marshal custody and continues to this day. What is the reversible harm from Mr. Loeffner's point of view of being involuntarily medicated in Springfield as opposed to being involuntarily medicated in Tucson? It's the additional liberty interest that the Supreme Court explicated in Vitek. The interest in being free from unwanted commitment to a hospital for treatment. Was this a situation, I don't remember, in which the person was previously imprisoned and the question was was he going to be imprisoned in a medical facility? That's correct. He was a convicted felon who was transferred to a medical facility. The Supreme Court said there's a separate liberty interest recognized under due process to be free from that additional commitment to hospitalization from the mere fact of detention. I think that's the interest that animates our argument about the need for these predictive findings. Is it your position that he's better off medically being in a high-risk solitary confinement in Tucson, Arizona than in a psychiatric hospital? That's a really hard question. Definitely. He is being medicated and he's being medicated because the prison has determined that that is the means that they choose to address his dangerousness. If he's going to be in a high-risk situation, we don't know, it hasn't been identified what it is, but solitary confinement is the usual one. Is that really good for his medical condition or is it better that he's in Springfield, that he sees his doctors every day and communicates with them, they watch him, perhaps change the medication as needed, are present in case they see signs that need to be looked after? I'm just wondering, I'm thinking of the person himself, where is the best place for him as far as his health is concerned? I'm not sure from the record I can tell that, but it strikes me that one of the burdens you'd have would show that he wouldn't be harmed to go back there. In fact, it would be better to his physical condition, his well-being, to be in a hospital instead of in solitary confinement. So maybe you could respond to that for me. I think there's several reasons why Tucson is the appropriate place. The first is that when the Bureau of Prisons decided to lock him up, their position is that that was the most effective means of addressing his dangerousness. From a health perspective, I think it's enlightening that the September 19th hearing we had where Dr. Pice actually informed the court that in her mind it would be most therapeutic for Mr. Loughner to return to Tucson so that he could visit with his parents. That is something that was not feasible for his parents to do in Springfield. She encouraged the court to have him come down there because she thought that that would be therapeutic for him. So he's had the opportunity to visit with his family. As far as contact with his attorneys, it's certainly easier for us to make contact with them in Tucson than it is in Springfield. As far as more medical issues go, looking at the Bureau of Prisons declaration, they have not said that they cannot medicate him there. When he first arrived in Tucson, they had the ability, they did put him on suicide watch and the suicide watch is the same watch that he would have in Springfield. His current situation in Springfield is solitary confinement. Is that at all in the record that we have in this motion? Yes, it is. You're talking about the record or the amended record? I'm sorry, the amended record? I'm not following. Well, maybe it hasn't gotten around yet. I've been advised that the district judge took the record and clarified some things that he thought were mistakes in the record and it's on its way to being filed or will be soon filed. I thought maybe you had an earlier copy of it, but you're working from the present record. I'm working from the copy of the transcript that we received yesterday afternoon. I understand that the court clerk has indicated that there are some changes. In fact, we contacted the court clerk about some other amendments or changes that our recollection suggests happened at the hearing. The record that the court has from the government on their desire to have Mr. Loft removed is simply that Bureau of Prisons declaration attached to their emergency motion response. Where would I find that in the record? The evidence you pointed out, the importance in being near the family and Well, it would be a hearing transcript from September 19th and I can't tell the court today whether that was attached to any of the pleadings. It certainly can be It was a reason to come back to this hearing. It wasn't a reason why he should stay here. Okay, it could be a different transcript than the one that was for the argument that we had before. Right, but I think the court can take solace in the fact that the medication is for dangerousness and they indicated that medication is the best means in their mind of addressing dangerousness. And that certainly is in the record. And I think that the fact that, I think we could point to the transcript from September 19th to show why they thought that Let's put it this way. I can't understand that Dr. Peiss would encourage the court to have Mr. Loftner come to Tucson if she believed that that would put him in danger. One other thing I can say is that Mr. Loftner is in the U.S. Market Counsel, this is Judge Pipey, but Dr. Peiss didn't say anything about leaving in Tucson for the next 4 or 5 months where he was away from his treating psychologist and his treating psychiatrist in a facility that doesn't really deal with long-term class 4 inmates. He's not living at home. That's true, Your Honor. And we certainly believe that while these issues need time to be resolved, expedited basis is appropriate. I think it's page 4 of the September 19th And in terms of the last thing you said, to me it seems to me that what we really need to do is to get the whole Harper issue resolved. And frankly, one of the reasons we haven't been dealing, dealt with it is because it's a moving target. So the best thing at this point is to get the Harper 3 determination, which is a currently operative one, whether he's in Tucson or whether he's in Missouri, in a shape for us to be decided. And one of my questions is, could you brief it in a week? We've been doing a lot of things in a week or less, and that's certainly... And the fact that he's spent, there's a way to I mean, to me the key issue at this point is, is he in Springfield or is he in Tucson? The question is, because all of it depends on him having, the only the projection of his improvement to competency depends on the Harper medication, right? I mean, and I'm going to add to your opposing counsel this as well, but there's no chance, everybody said there's no chance that without the medication he's not going to get better. So we have this kind of bootstrapping where on the one hand he's being medicated for dangerousness, but on the other hand that's being treated as sort of a background event with regard to the question of whether he's going to get more competence. And that's our circumstance, right? Absolutely. I mean, I think the prison as well as the government have taken the position that medications are absolutely necessary to restore him to competence as well. And the court needs to resolve that issue. And meanwhile, if there are briefings going on in the district court on the cell hearing question, I noticed at the end of the hearing he asked for that. Is that happening? I'm sorry, could you repeat that, Your Honor? If there are briefings going on in the district court on the cell question, at the end of the hearing Judge Byrne said he was going to have briefing on that question. He was just quiet. And then what happened? Yesterday we filed a response to the court's invitation to brief this issue. And the government has certainly explicated their position in some of the previous filings. I think it's fair to say the government's position is that the prison made a determination under Harper to medicate for dangerousness grounds. Therefore that issue has been decided. The government, I think it's fair to say, reads cell as stopping at that. If there's a reason to medicate other than for competency, dangerousness, there's no further inquiry under cell. The court has suggested tentatively that that would likely be the court's position. The court has referred to a pro forma cell hearing if it conducted a hearing. It's suggested that it may be over because there has been a Harper finding by the prison. We certainly would encourage the court and have in our filing to recognize that even if the court was going to do a dangerousness determination, it would have to be under the standard that we briefed before this panel, which is essential considering less intrusive means to mitigating danger. And that would have to be a judicial proceeding with evidence of clear and convincing standards. There is that briefing going on, but I don't think that it's going to address these fair trial concerns that are raised by him being committed back to Springfield and also the liberty and interest in not being committed against his will to hospitalization. Can I ask one question? It's on a little different area, but it will help me substantially in reviewing this case. In reading the cases, I have come to the conclusion, and I want you to correct me if I'm wrong in this, that our standard of review would be for clear error because it's essentially a factual determination. Do you agree with that? I don't, Your Honor. What case do you rely on that would say it was some other than facts, clear error? Well, I need to grab our reply, but I know that we briefed the issue of legal determinations or legal matters or legal standards are governed by the de novo standard. And what we have pled, I read that part, that there are several cases in the Supreme Court that say we're substantially factual and it's a clear determination. And I haven't found, I found an unpublished decision from our court that says this is the standard of review for clear error in this type of case. I haven't yet found a published opinion by our court that says that's the standard of review, but it looked like to me that the unpublished disposition made good sense. What case would you cite to us as to what our standard of review would be for this motion on the sting? I believe we cited the Cavicong, and I know I mispronounced that, the Donbach decision. And not to avoid your question, Judge Wallace, but it would be clear error if the district court applied the incorrect legal standard. So whether we call... In regards to that, is that the capacity-competence distinction, or is that the notion about whether substantial probability is the thing else? So there's obviously the wrong legal standard that you're concerned about. Well, we're concerned with several of what we believe are legal errors in the court's commitment order. The first would be the capacity issue, that capacity, or the capacity to proceed with trial is something more than trial competence, as evidenced by Riggins and Sell and other cases. There's also the legal concern about the standard of review, but that's not one that we briefed as the serious question in support of the state. So yes, the primary legal issue presented is what findings must the court make before it can determine that there's a substantial probability that the defendant will reach the capacity to proceed? And I think you're about out of time, but I have one more question and we'll see if my colleagues do. What would you say is the, since the district judge did say in his last order that he did take into account the impact, at least on aspect, as I understand it, and on appearance, so what would you say is clear error, or any error, whatever our standard is? What standard would you say applies to that, and what would you say? In other words, he's saying he did apply the right standard. You're saying, but since he's saying he did, and I don't know how we get behind that, the question is is there clear error? Or what standard do we apply to his statement that he did do this? Well, I think that statement would be clearly erroneous, and under any standard that statement and his Monday morning decision is not supported by the court. There are two places where it's most clear from the proceeding, and the first is pages 282 to 283, where he acknowledges that there are some side effects, that this is not the appropriate time for those issues to be urged. I can point to another point in the proceedings when he told defense counsel on cross, and I believe this is pages 248 to 249, the court, hold on just a second, Mr. Kahn, I'm convinced that we're way off track. He did say that, but at that point they actually weren't talking about side effects, and the side effects discussions had gone on for a very long time by then. Right, but what's critical is the next part of the court's statement. I didn't frankly understand it when Mr. Kleindienst got into side effects, which is not the subject of this hearing. The court reiterates on page 283 that this is not the appropriate time to urge these arguments. The court nowhere in this What do we do with that? Well, I don't think that it could be... I don't think that the court could have reconsidered on the record where the counsel was admonished that they could not delve into side effects. I don't think even on the record... Counsel, this is Judge Bivey again. That conversation I think is in the cross-examination of Dr. Ballinger. Am I correct on that? That's correct, Your Honor. Okay, now Dr. Ballinger didn't examine Mr. Loftner. What he was talking about were side effects that apply that are seen generally when people are treated with psychotropic drugs. So what kind of findings would the district court have had to have made in this case, and how could he possibly have made those findings, since I don't think that either Dr. Pike or Dr. Ballinger could make any predictive judgments about what would or wouldn't happen to Mr. Loftner once he's gone through a four-month regimen of psychotropic treatment. Well, that really is the rub where the government has the burden to demonstrate that it's substantially unlikely that side effects are... Okay, what does the government have to prove there? The government would have to prove that there is an ongoing treatment plan that is, at least in this case, I mean, remember we have a case where the medication is already occurring. And Dr. Pike, while she may not have been in the best position to talk about potential side effects, would be the government's error. Dr. Sears and Mr. Loftner's treating psychiatrist, the one who Dr. Pike repeatedly said would be the one with the expertise in this area, did not testify. But Dr. Pike provided enough testimony about perceived side effects of expressionlessness, of what she called a flat affect, of sedation. The court itself made findings of Mr. Loftner's demeanor and appearance. They're sufficient to suggest that the court cannot have made this finding that there was no potential side effects that would impair or infringe on Mr. Loftner's fair trial rights. Okay, we'll give you a little time for rebuttal and let us hear from the government. Thank you very much. Good afternoon, Your Honor. Chris Cabanillas on behalf of the United States. Can you hear me okay? Fine. The government respectfully asked this court to deny the stay. I think perhaps hitting on the points that this court asked us to address, this last point about the court not considering things. I think the court is correct in its order from Monday where he says that there's sort of an overly parsed view of what the court did. If you look at the whole record, there is an abundance of evidence demonstrating that the medication that the defendant is on is assisting not hurting him. And when the court then says in his 10-3 order that he has considered the medication, the dosages, he considered all of that, I think the record bears that out. So I think whether he considered matters, I mean first you have to agree with him. I gather you don't. This distinction between capacity to proceed and confidence. But it is interesting because the language in the statute is different. If you assume that, because that as I understand the basis for the legal argument, then the question is, did the district court make a finding that goes beyond these three competence considerations that Dr. Pyatt's outlined, and if so, did he make it with adequate record? First, Your Honor, I think we would say that the district court properly rejected the notion that it had to sort of graft on top of the statute something beyond whether or not there's a substantial probability that he can be restored to competency. I mean, I think the record is... That isn't part of the argument. The statute itself doesn't say that. The statute says, is there a substantial probability that he will maintain the capacity to go forward. And it is not, doesn't seem to me to be bizarre to say that if there's a self-component to whether the proceedings are going to be able to go forward, which isn't only competency in the narrow sense, then that's part of the statute. It's not grafted to the statute. That's the argument. Okay, Your Honor. I think I would just have two responses to that. You know, the first would be that as this court noted, a member of this court noted, this court had already said, and at least again exhibited in the order from 10-3, that it did consider side effects in the competency determination. And there's that language, to be perfectly clear, the court would not have found the defendant can be restored to competency if it entertained any serious concern that the medication prescribed would be debilitating at trial. And so the court, when the court was talking about how it was going to be allowing the defense to engage in this fair trial right analysis later on down the road, it was recognizing that this is not an issue that's going to conclude. The court will have to make a determination about whether or not the defendant can be competent, and it's part of that. The court's going to be considering all these things, and as evidenced by the 10-3 order, it already has. I'd also add that the defendant's argument has morphed somewhat here. When it comes to the fair trial argument, this court  has always been that these drugs that the defendant's taking are going to cause these horrible and perhaps fatal side effects, and basically an argument of impairment, that they would somehow impair him. I think that's the essence of their whole Riggins argument. But in the reply to this motion, I noticed that their argument now has morphed to one that the medication is so helpful that he is going to appear apparently normal as opposed to psychotic. That was always part of the argument because it was part of Justice Kennedy's concurrence in Riggins. Actually, I think, Your Honor, the majority in Riggins noted that the question about whether medication would affect him at trial, they were concerned about whether it could, quote, make him uptight, whether he would suffer from drowsiness or confusion, whether it would affect his – and I'm reading from Riggins at page 137 to 138 – whether it would do anything to affect his ability to testify, interact with his lawyer, or comprehend things at trial. So they were talking about impairment. This notion that the drugs are now so good that they're helping him to appear normal seems 180 degrees different than what they've been advocating before, and we would submit it also seems to undercut any kind of notion that the district court's determination that he is restorable to competency is somehow flawed. If the medication is working so well that he will apparently appear normal at trial, then it seems to be, sort of, again, another argument that seems to cut against an argument they're making. How about, again, the irreparable harm question? When I asked the question, the answer was that VTEC says that there's an additional deprivation of liberty here that is irreparable harm. Do you have a response to that? Your Honor, let me just grab VTEC. I had it in my hands and it has now disappeared. Oh, here it is. Forgive me. You know, in VTEC, I would submit – I think the question was asked whether or not that case is on all fours. We would submit that it's not. I mean, there was – they quote at 445 U.S. at – it looks like 494 to 495 that there was stigmatizing consequences of a transfer to a mental hospital. You know, this individual already has been determined to be incompetent, already has been transferred to a mental hospital, and we would submit – well, not a mental hospital, per se, but a federal medical facility. And Judge Wallace, when you ask that question, is he better off? He is better off. The information in Exhibit 7 clearly demonstrates that he is better off in this medical facility rather than being here in the United States prison in Tucson or in Arizona. They don't have a federal medical facility, so it's really causing problems for USP Tucson to continue to maintain because he is a Level 4 individual because of his mental illness, because of his dangerousness, his suicidal – other things that make it very, very difficult for them. There's no on-staff psychiatrist. There are people who have to be sort of diverted away. This is just not the kind of facility, frankly, where he will, number one, progress as quickly as what Dr. Pice would suggest he is capable of progressing. And we would respectfully ask the Court not to stop his transportation and sort of interfere with that progression when the defendant's arguments are without merit. The – but I'm trying to separate out the without merit from the irreparable harm. And I – that's why I asked about the irreparable harm in particular. In terms of the irreparable harm, I guess I would say that they haven't really demonstrated – and I guess this gets to Vitek, too – where is his irreparable – how is he irreparably hurt by going to another facility where he's in custody, but a place that is going to be even better in terms of taking care of his mental illness? That is something that I think that they have not – that's a question asked by Judge Wallace. It's just how is it – what is that irreparable harm on that point? I don't think they've really established that, Your Honor, Judge Berzon. And secondly, again, there are difficulties and practical difficulties here that the government just wants to make sure that the Court was aware of when it comes to, you know, is it a better idea to keep him here versus to take him to Springfield? Overall, you know, everything is militating, demonstrating that, number one, they haven't demonstrated irreparable harm when this happened, and number two, that it actually is very – it's causing a hardship on the Bureau of Prisons to maintain this particular setup. The whole determination, factual finding of restoration of confidence rests on continuing the medication which is being done for another reason, or not directly for restoration of confidence, right? In other words, it's clear that without the medication, no restoration of confidence. But the medication has to be done to restore the confidence that's being done because of danger to self at this point. He's being medicated based on his danger to self, and the testimony would support that it is the medication that is causing this great improvement in his condition. Now, suppose somebody was to – suppose  Your Honor, in terms of the justification, as long as there's been a finding that he's a danger to himself, and the justification demonstrates in the Harper III paperwork at Exhibit 9 that if the medication was withdrawn, he would go back to being in that position where he is gravely disabled and a danger to himself. But the only thing that's unusual about this case is that he wasn't declared to be a danger to himself originally. It was only after the original Harper medication which was for purposes of danger to others, supposedly, and when that was withdrawn and then he was put on suicide watch, and then he seems to have deteriorated terribly. But I gather from everything I've seen that from the time he arrived at Springfield until the first medication order, nobody was claiming a danger to self. Your Honor, I think the testimony at the hearing supports – there was a comment about, and I care for Dr. Pites' testimony, but that he actually regressed back even further than what he was when he first was there. So in other words, it was – The fact of the matter is it seems conceivable that somebody could say, well, he's still psychotic and he's still not competent, but he really wasn't dangerous to himself when he came in here and we really can't say if we took him off the Harper medication whether he'd be dangerous to himself as opposed to still psychotic and still not competent. Your Honor, I guess I would ask the Court to credit the information given by Dr. Tom O'Leary in the last paragraph of the justification for the Harper 3 medication from September 15th where he says that he thinks virtually certain that if the medication was taken away that he would go back to being the same danger to himself and grave disability. And also we have testimony from both Dr. Pites and Dr. Ballinger on that from the transcript of the hearing, and I would ask the Court to credit those experts as the District Court did. What about the question I asked previously in terms of finally getting to this Harper order in a way that it's not a moving target? Since we now have yet another Harper determination and since that's really what's underlying everything at this point, including the justification for the recommitment, can the government brief that in a week so we can get an opinion out and get that resolved? May I ask, when you say the government briefed something in a week, may I ask what you're referring to? What I'm talking about is the merits of the Harper 3 hearing. I understand there's an appeal pending from that. You said in your papers that you weren't sure they were pressing forward enough, and we've now been told that they are. And as you know, we had an earlier briefing and argument on an order that is no longer in existence as I understand it, and then there was another two more when there was an emergency order, and then there was another Harper order which was superseded. And finally now, as I understand it, we have an operative actually being implemented Harper order. And it would seem to me to make the most sense for this Court to rule on that than to rule on one of the three other ones that isn't currently operative. So to me, that is sort of the core problem underlying all of this, which doesn't go directly to today's emergency stay question, but it underlies it all, and it would be most sensible to get that resolved as quickly as possible. And I don't see how we can do that without some briefing from the parties as to that actual order. But since there's been so much paper over the bridge by now, all it would really require would be some discussion of that order itself, not of all the background legal material, because we've already done that, and how it complies or doesn't comply with whatever legal requirements you think applies. And I don't know why it couldn't be done in a week. Your Honor, I think my first comment would be that we would ask the Court to deny the stay as soon as possible, because we want the defendant to get on to Springfield. But secondly, to answer your question, we will operate under whatever briefing schedule this Court employs. If it asks the defendant to file his opening brief in this case, that case in a week, I have no problem if the Court says we need to do our answering brief in a week, presuming we have all of the record on that. Again, we will comply with whatever order the Court issues. And I do understand why you'd like to kind of bundle all this stuff. It does make sense. I understand. Do you have the record for Harper 3? Is there anything that you're missing that couldn't be briefed? Let me think. I think we have the argument on that, because we have the Court's denial of it as of this past last week. We have the Court's written order. I'm talking out loud here. We have the underlying documents. I don't think there's anything the Government would require. No, Your Honor. But also, we would like to be able to respond to the defendant's opening brief. We wouldn't want to have simultaneous filings. I think that there's been a little bit of mystery about what it is the defendant is actually going to do here. So we just ask the Court to give us the courtesy of allowing the defendant to actually fire the first shot so that we can see what they're arguing and then be able to address it in an answering brief. Do you have any more argument, or do my colleagues have any more questions? Your Honor, I guess I would just ask the Court to deny the stay and allow the defendant to go back to Springfield. We'd also respectfully submit that it is a hardship to BOP if he remains here in Arizona. And we'd also say that the Court's decision to deny the motion to stay was not an abuse of discretion because now that he has denied it on Monday, it's reviewed for an abuse of discretion. Other than that, I don't have anything else, Your Honor. Thank you very much. I'd like to ask the Government whether you've seen the amended transcript which is involved with the order in this case. Yes, we received an email on that. We suspect the Court reporter may make some other minor changes, but that would not preclude us from being able to comply with any briefing scheduled at court. I'm asking a separate question. I don't necessarily tie what we're doing today in with briefing and the final merits. We have a motion to stay before us, which takes, in my view, precedence. But I only have what the original transcript was. If there's no misspellings or something, that's one thing. If there are major changes, then we've got to wait until we get that amended transcript, I suppose, before we can make a decision on the motion to stay. From what I understand, from what I remember seeing in the email when I got it from the Court reporter, it looked like the changes were ministerial, not major. Okay, thank you. Okay, Mr. Johnson. Thank you, Your Honor. I'll try to be brief. I agree with Judge Bybee that Dr. Pites and Dr. Ballinger were not in a position to provide the Court with sufficient information to make a predictive finding. To the extent that the Court now says that it has made that finding, the Court never announced that the burden of proof was on the Government to disprove side effects. Under this circuit's decision in Hickson, that failure to set forth the correct legal standard is an abuse of discretion. Counsel, I think the part of my question goes to something very different, which is that I wonder whether the defense here has asked the District Court and the Government to satisfy an impossible burden. That is, Dr. Pites and Dr. Ballinger didn't make a predictive judgment about Mr. Locker because they can't. And I don't know how the District Court could make a predictive judgment at this point. There's no evidence of serious side effects at this point. And I don't know how anybody could satisfy a burden of predicting that in four months he won't have suffered any side effects that might be of concern or worth discussing. Well, again, it's predictive. And it's a substantial probability, not a certainty or a complete uncertainty. But I think that the side effects that the Court did acknowledge as existing are significant, particularly in a case of this nature. I'm sorry, I lost my train of thought. If I can turn for a moment to irreparable harm, there was concern about the safety of the conditions that USP-2 signed. That certainly is not the universe of possibilities for the Marshals. But the Government has urged that the harm is that Mr. Lochner can't continue his treatment, or as the Government said, his progression. Well, that's the very liberty interest that we're seeking to preserve. I think there's a substantial question about whether the Court applied the correct legal standard and whether the facts supported that. And sending him back to Springfield would be to invade the very liberty interest that Mr. Lochner seeks to avoid by this decision. I have a question for you. In several instances during your argument, you pointed out that the Government had failed in this burden or failed in that burden. But considering we have here a motion to stay, the burden of proof is already set not only by our Court in Maxwell Jolly, but by the Supreme Court in Enkin, that the burden of proof is on you, on the defendant, to show why we should stay. Do you have a case that indicates that those, Enkin and Maxwell Jolly, are no longer in effect? Your Honor, the case is, is it Leyva? Leyva Perez, which says if there's a serious question, and this is the very standard applied by the motions panel that originally stayed the first medication order, that if there's a serious question, that the balance of hardship tilts in favor of the defense. And I think that we certainly have presented a serious question that implicates several constitutional rights. If I can just say, as you can figure out, we may or may not agree with our colleagues the first time, but I'm more concerned to be specific, not about using our former colleagues as the basis for your burden of proof argument, but whether you can distinguish Cal Pharmacist of our court, and Enkin v. Holder of the Supreme Court, where they clearly said the burden of proof is on the person wanting to stay. And I agree that the burden of proof is on us. We haven't disputed that. And I think we have established our burden. We don't need... I believe we've met our burden. And I'm not suggesting that those cases don't fall under our control. One concern I have about Judge Bybee's question of, well, can anyone ever do a predictive analysis? That's the very analysis that SELL requires. And that Riggins contemplated is necessary for a fair trial. So I think it is an analysis that can be engaged in. But if I can just remind the court of one other important point. SELL may require it, but the question is, as of when does it require it in a circumstance in which there's a Harper order? And that's why I keep wandering back to the Harper order, because if there is medication going on anyway, the question of, it may make a lot more sense to put off questions about the ultimate impact on trial until the time closer to trial. But then the question is, how do you make the underlying decision? Well, I think that that's a separate liberty interest. It certainly is implicated and intertwined with the liberty interest involved in the decision to extend the commitment. But we have new liberty interests that can't be completely subsumed by the prison's ability to medicate. Mr. Lofner could be medicated in civil commitment, but when you send him back for restoration for purposes of becoming competent for trial, you've necessarily implicated these trial rights that can't be subsumed. This is part of the capacity argument. In the ordinary case, a SELL order is probably already issued. The government has requested medication before the commitment is extended, or simultaneously. So these analyses perhaps fold into one another. But we have a unique case where they medicated first, but that can't completely undercut the separate and distinct liberty interests identified in VITEC and articulated in Jackson when they said that it has to be the capacity to proceed to trial. Was capacity the term used in Jackson? Capacity was the word used in Jackson. One last question. There was some discussion earlier about this issue of some interest in essentially appearing psychotic, psychopathy psychotic. Do you continue to rely on that, and how does that get taken into account? It's hard to understand what you have a hearing about that. That's one piece of the SELL written piece that's hard to get, because either there's an interest in that or there isn't an interest in that, and a particularized hearing doesn't seem very useful. Well, it's a very hard question, and I think at this point it's sufficient to say on this record that there are some side effects that are of concern to a fair trial in any case. The Riggins? It's just drowsiness, looking lethargic, looking affectless, and so on. But that's sort of different from this notion that he's going to appear normal. Even if we clear all that up, he's going to appear normal, and that's going to undermine his argument that he is. Well, it may be premature to add to the point of motions or notices of mental health offenses. I remind the Court that the government moved for a competency determination very quickly in this case, and we're not at that point. I guess it's the best answer I can give, but we are at the point where there are some noticeable side effects, that there's evidence that medications have been changed. But the one piece of evidence we're missing that I think would help the Court make a predictive analysis is what is the treatment going forward? The defense was objected to on asking questions about future changes in medication, and Dr. Peitz avowed that she doesn't have an expertise in a particular medication, so that's something we'd have to ask Dr. Sears. Knowing what the intended treatment plan is is very important. What changes do you think you might have to make? What changes may you not have to make? Even minor changes in medication could cause significant side effects, and that's what I think is envisioned in this predictive analysis before we recommit him. And we're missing that piece. That's what makes it so hard to do any predictive analysis, but it's one that is underlied by this constitutional issue, it's underlied by the statute and its construction itself, and it's one that simply can't be avoided, even if it's a difficult question. Okay, thank you very much. Thank you. Thank you, Your Honor. And we will be issuing an order when we issue our order, hopefully fairly soon. Okay? Very soon. Thank you very much. Thank you. Thank you.
judges: Wallace, Berzon, Bybee